judge Roane.
In the year 1794, the legislature passed an act, at the suggestion 01 au individual, ‘c ior establish-/l inor a Mutual Assurance Society against fire, upon build- . „ , . , , , . . , ings in this state.” It provided lor a subscription to the scheme, by individuals, and declared that the principió of the assurance should be, “ tliat the citizens of this slate may et insure their buildings against losses and damages occasion-u ed accidentally by ¡aras., and that the insured pay the losses “ and expenses, each his share, according to the sum in- “ sured.” The act contains a few other provisions, which may, also, be considered as forming a part oí' the princi=■ pies of the institution j but none of them are perhaps of so fundamental a cast as this j nor apply so immediately to the ease before us. The act further provided, that as soots as three millions of dollars should be subscribed, the subscribers should meet together, examine the system submitted to the legislature, and conclude on such rules and regulalions, as to a majority of the subscribers might seem best; and that the said society should be at liberty, from time to time, to alter and amend the said rules and regulations, as they may judge necessary ; and in particular, that they should agree upon the premiums to be paid. The act also provided, that as soon as the society should have acted in the premises, and elected their agents and officers, it should be considered as incorporated by virtue of the act.
It is evident, that every thing touching the question before us, is left to the pleasure of the society itself by this act, or at least, every thing that does not invade the principle before mentioned, or some other principle admitted to .be fundamental; and that some of the powers expressly recognised by the act, as appertaining to the society itself, (that of fixing and altering the premiums for example,) are equally as important and as liable to be abused as the principle in question ; which, it is urged, has been infringed by the act of 1805, effecting a separation between the interests bf the towns and those of the country. Tne power to d«* *346 right, unavoidably involves that of doing wrong; an adequate security to individuals, however, is, that the general will of the society finds no motive for injustice or oppres- . . , r , . ... sion. The true question, therefore, before us is, whether an3? fundamental principle exists in the case at bar,- inter-the separation of the interests in question—and if there be, whether the subsequent legislature had power t® invade it ?
These questions, and especially the last, involve great and momentous considerations. The near approach of the dose of the term, does not allow me time to digest and arrange my ideas upon it, to my satisfaction ; but as the interests of the society, and the public, demand a speedy decision, I shall not hesitate to give one.
In order to shew that the act in question is no law, and therefore, it is further urged, is a compact, and as such is beyond the power of a succeeding legislature, Blackstoné’s definition of municipal law has been, relied on. Municipal law is defined by him to be “ a rule of civil conduct “ prescribed by the supreme power of the state, command- “ ing what is right, and prohibiting what is wrong j” and it is argued, that the act in question is no law, under this definition, .for want of the generality implied by the term. “ rule,” and because it is said to be not so much in the nature of a command by the legislature, as of a promise or contract proceeding from it. When we consider, that mere private statutes and acts of parliament, are (even by' this writer himself) universally classed among the municipal laws of England; nay, even that the particular customs of that kingdom, are admitted to form a part of the municipal code, it is evident, that this definition of municipal law, is by far too limited and narrow. I would rather adopt the definition of Justinian, that civil (or municipal) law, is, “ quod quisque sibi populus constituitbounded only in this country in relation to legislative acts, by the constitutions of the general and state governments ; and limited also by considerations of justice. It was argued-by *347 3 respectable member of the bar, that the legislature had a right to pass any law, however just, or unjust, reasonable, or unreasonable. This is a position which even the courtly judge Bluckstcne was scarcely hardy enough to contend for, under the doctrine of the boasted omnipotence of parliament. What is this, bat to lay prostrate, at the footstool of the legislature, all our rights of person and of property, and abandon those great objects, for the protection of which, alone, all free governments have been instituted 1
For my part, I will not outrage the character of any civilized people, by supposing them to have met in lature, upon any other ground, than that of morality and justice. In this country, in particular, I will never forget, “ that no free government, or the blessing of liberty, can, “ be preserved to any people, but by a firm adherence to “justice, moderation, temperance, frugality, and virtue, “ and by frequent recurrence to fundamental principles.”(a) I must add, however, that when any legislative act is to be questioned, on the ground of conflicting with the superior acts of the people, or of invading the vested rights of individuals, the case ought to be palpable and clear: in an equivocal or equiponderant case, it ought not easily to be admitted, that the immediate representatives of the people, representing as well the justice as the wisdom of the nation, have forgotten the great injunctions under which they are called to act. In such case, it ought rather to be believed, that the judging power is mistaken.
With respect to acts of incorporation, they ought never to be passed, but in consideration of services to be rendered to the public. This is the principle on which such charters are granted even in England; (1 Bl. Com. 467.) and it holds a fortiori in this country, as our bill of rights interdicts all “ exclusive and separate emoluments or privileges from “ the community, but in consideration of public services.” (Art. 4.) It may be often convenient for a set of associated individuals, to have the privileges of a corporation bestowed upon them; but if their object is merely private or selfish: *348 if it is detrimental to, or not promotive of, the public good, they have no adequate claim upon the legislature for the Prtv^eE'c* 33 **• *s possible that the legislature may be *mPoscd uPon in the first instance ; and as the public good and the interests of the associated body, may, in the progress of time, by the gradual and natural working of events, bp thrown entirely asunder, the question presents itself, whether, under such and similar circumstances, the hands of a succeeding legislature are tied up from revoking the privilege» My answer is, that they are not. In the first case, no consideration of public service ever existed, and in the last, none continues to justify the privilege. It is the character of a legislative act to be repcalable by a succeeding legislature ; nor can a preceding legislature limit the power of its successor, on the mere ground of volition only. That effect can only arise from a state of things involving public utility, which includes the observance of justice and good faith towards all men.
These ideas are not new ; they are entirely sanctioned by'the sublime act of our legislature, “ for establishing re-a ligous freedom.” That act, after having declared and asserted certain self-evident principles, touching the rights of religious freedom, concludes in this manner: “ And “ though we well know that this assembly, ejected by the “ people for the ordinary purposes of legislation only, have a no power to restrain the acts of succeeding assemblies, “ constituted with powers equal to our own, and that, there- « fore, to declare this act irrevocable, would be of no effect a in law, yet we are free to declare, that the rights hereby « asserted, are of the natural rights of mankind, and that « if an}' act shall be hereafter passed, to repeal the present, u or to narrow its operation, such act will be an infringe-u nient of natural right.” Conforming to the principles declared in this luminous exposition, I infer, irresistibly, that the power of a succeeding legislature is bounded only, (and that in cases of no equivocal complexion,) by the principles and provisions of the constitution and bill of rights, and *349 uy those great rights and principles, for the preservation of which all just governments are founded. It is not my iniention to go into detail on the present subject ; but the power of the succeeding legislature is neither to be limited bv a state of things, which (an aforesaid) leaves no beneft rial residt whatsoever, to the community, nor by those petty inequalities and injuries, which arise to some individuals or classes of men, under every general regulation whatsoever. Í will not say that the reason of the law ceasing, the law itself ought to continue ; nor that we are to expect entire and exact justice, under any system whatsoever.
Under the actual case before us, I might, perhaps, have spared myself the necessity of this discussion. The principle stated in the act of 1794, which is supposed to have interdicted the separation in question, is couched in terms extremely abstract and general. While other principles declared by this act, have dearly and expressly confined the benefits of the institution to citizens of this state, and limited insurances to losses occasioned accidentally by fre ; while it is clearly provided that retribution is to be made by the insured., and that according to' the sum insured, the principle now immediately in question does not seem to prohibit a division or distribution of the members, or their interests into classes, or districts. There was no motive for a restriction upon the society in this particular, especially in an institution of the first impression ; and there is no reasonable fear of abuse by the society, of a power equally useiul to all, and liable to produce injustice m one quarter as well as another. It was deemed proper to allow to the society the benefit of experience ; and as other powers of a ch-raster as important as the one before us, were confessedly granted to the society at large, wherefore should this be withheld ? Referring to the contemporaneous and successive construction of the act of 1794, by the society itself, always acquiesced in by every member, it will be seen that ■the society itself, inter alia, extended assurances to losses occasioned by lightning also; (whereas the original act *350 seems to have contemplated ordinary Jires only;) that they from the benefits of the institution certain combustible houses and buildings; and of-their own mere auprior to the existence of any legislative prov*s'on t0 t^ai effect, permitted individuals to withdraw from the obligations they had incurred under the original institution. While it is far from my intention to'arraign these wholesome and salutary exercises of power, on the part of the society, in general meeting, I contend that these and some other powers are of a character as important, perhaps, as that of effecting a separation. \ . •, thority, and
From these considerations, it would, perhaps, result, that the regulation in question did not require legislative aid to carry it into operation, but might have been effected by the society itself. That, however, is taking a broader ground than is necessary to be maintained on the present occasion. That aid having been afforded by the legislature, it is enough for our purpose that the act of 1805, if it has produced any injustice at all to any class of subscribers, has fallen short of that crying grade of injustice, which alone can disarm the act of its operation. The society itself, at least, considered this, on the contrary, asa measure essen-' tiai to the equalization of the risks ; and, in this respect, I see no cause to differ from them in opinion.
By referring to the principle of our law respecting corporations, the foregoing results will be fully justified. Those artificial persons are rendered necessary in the law from the inconvenience, if not impracticability of keeping alive the rights of associated bodies, by devolving them on one series of individuals after another. The effect of them is, to consolidate the will of the whole, which is collected from the sense of the majority of those who constitute them. This decision by a majority is a fundamental law of corporations in this country and in England; in which respect our law differs from the civil law ; it requiring the concurrence of two thirds of the whole members. It is also a fundamental principle of corporations, that this majority *351 aft ay establish rules and regulations for the corporation, (which are considered as a sort of municipal law for the body corporate,) subject only to a superior and fundamental law which may have been prescribed by the founder thereof, or by the legislature which grants the privilege—perhaps, also, these petty legislatures ought further to be limited by all those considerations, (including the due observance of justice.) which 1 have endeavoured to shew, ought to bound the proceedings of all legislatures whatsoever- If, however, there be no such paramount law, or overruling principle, the mere will of the majority is competent to any regulation. I have endeavoured to shew, that ao principle exists in the case before us to answer the foregoing character ; that the one suggested is entirely abstract and indefinite as to the point in question ; and that it does not appear that any injustice has arisen, or can be reasonably expected to arise, from carrying the measure in question into operation. But further, a corporation may be extinguished by the surrender of its rights and franchises; as to which the unanimous assent of every individual is not requisite. The will of the majority must prevail in this, as in other cases. ft is not to be expected that this kind of suicide will be committed for light causes ; and where causes of greater exigency require it, the corporation should not hesitate to make the surrender.
I will put a case, which will exemplify my meaning. By the charter establishing the College of William and Mary, it was a fundamental law of the institution that a .Divinity School should be kept up, for promoting a Seminary of Church of England Ministers, and another for the instruction of the neighbouring Indians in the arts and sciences. Both of these have, by common consent, which amounts,. quoad hoc, to a surrender, been discontinued in the seminary, although they were required by the fundamental law thereof. A state of things has arisen, which has put down the then established church, and given to other sects of religion their equal claims to the benefits resulting from that institution»*»-'’ *352 atí institution, to the endowment of-which, considerable" portions of the public property were contributed 5 and as for. an Indian school, that has been rendered unnecessary* ' ' • * ^ , i r " ■ « . among other considerations, by the change oí our relations *n respect of those aborigines, and from their remoteness at the present day from the seat of that institution. ’
As it is.not expected, that corporations shall exist for ever, when the reasons for granting them shall have passed away, and no public utility can ensue from their continuance,, this right of surrender must incontrovertibly exist, evén in derogation of the fundamental laws and principles. In the case before us, the resolution of the society,' on which the act of 18Ó5 was bottomed, may be considered as such surrender, and that act as the acceptance thereof. The interests of the institution commenced thereafter, as it were, dé novo; and provision Was made for á revision, • and revaluation of the houses in the towns and in the country, as thús separated! Whether, therefore, the measure Adopted by the society in 1805, and sanctioned by the legislature, be considered as a legitimate change, by the society itself, of an ordinary regulation, or as a surrender which destroyed 3 fundamental one, the effect as to the question before us, is precisely the same.
I have thus despatched, as well ás time will permit, the great question on which this case depends. It remains to say, that no act can be done by the society, but in general meeting, as to the time and place of which the law has provided, there shall be full and adequate notice * and this is a sufficient security against surprise. I will also Acid, that if any class or set of individuals are so peculiarly circum-' stanced, as that their interests should conflict with those of the majority of the society, while they have undoubtedly contracted to be bound by the suffrages of that majority, they are also protected from oppression, by the liberty guaranteed them, of withdrawing from the institution altogether. It is better that an inconvenient member of the *353 society should be lopped off, than the whole body corporate should perish.
One objection of a minor character yet remains to be disposed of. It is that the requisition, under which the , , . , , quota in question was demanded, is illegal ; it having been adopted by a president not duly elected, it is said, he not having been previously elected a director.
By the original act of 1794, the power of choosing a president and directors, without any restriction whatever, is admitted to belong to the society at large, in general meeting. By the act of 1805, the legislature has provided that the president shall be chosen out of three directors, the whole to be chosen by the meeting ; whence it is inferred there must be two separate and distinct elections. The objection in question does not come well from those who contend, that the act of 1794 contains fundamental provisions, which even the legislature is not competent to alter,
I will not stop to inquire, whether the society at large acquired an exclusive and indefeasible right in the premises» under the original act of 1794, which will bear out the present proceeding ; I will consider the case as standing under the act of 1805 only. I will here remark, that I understand the case agreed, as only admitting that Mr. HRae was not previously appointed a director, by a separate and distinct appointment: I do not understand it to admit, that the society did not appoint him a director eodem fatu, that they appointed him president. By the terms of the act of 1805, a previous election as director is not necessary ; and, certainly, there can be no substantial reason for giving to it sucha construction. There can be no real utility in requiring an unnecessary circuity of proceeding ; and as a previous election as director, was not required by the act, there was no objection to the society husbanding their time by appointing a president and director (both of which characters are to combine in the same person) at one ballot.
*354 In every-view of this case, therefore, .1 am of opinion, that-the judgment of the District Court is correct, and ought - to be affirmed.- '
Judge Fleming.
e ~ t - 1 he appellant, m the Court below, rested his defence on two points. 1st. That Alexander M.'-Rae, who acted as president of the said society, when the stud resolution was passed, was not duly and lawfully elected ; he not having been, previous to his appointment as president, appointed a director, as by law directed ; and, 2dly. That the motion could not be maintained under the act of 1794, for establishing the society ; the requisition on which it was founded not having been made in conformity therewith; nor under the act of January., 180S, lately adopted át a general meeting ; the said ¿reí'having attempted to increase his risk, without his consent.
With respect to the first objection, there seems to me to be no weight in it. By a regulation of the society made in the year 1795, its business was managed by a president and fourteen directors. That regulation having been found inconvenient, it is by the 9th section of the act of 1805, declared, that “ there shall be in future only three directors, out of “ whom a president shall be chosen.” I construe this clause in the act, in the same manner as, if the words had been, “ there shall be in future only three, directors, one of whom 61 shall be president.” And as to the mode of his election, it appears to me-immaterial whether he was first elected president, and afterwards the same day chosen one of the three directors, or had been first chosen a director, and afterwards elected president; as he was on the same day .(and long before the resolution making the requisition in question), both president and one of the three directors ; and so it was admitted by the appellants’ counsel in the argument, .which 'was perfectly consistent with the true meaning and spirit of the law. •
2. As to the second objection, that, at first view, seemed to have been of more consequence; but, on due consideration, *355 'that also seems to be unavailing. The first institution of this society, which, as was generally supposed, would be of great convenience and utility to the community at large, was a mere matter of experiment, and which must probably 1 ’ 1 . J undergo such changes and modifications as experience should point out, in order to make it more equal and extensively useful to the community. In contemplation, then, of these circumstances, the Legislature, in the act that established and incorporated the society, provided by a special clause for the purpose, that “ the society, or a majority of them, “ shall be at liberty, from time to time, to alter and amend “ the rules and regulations as they may judge necessary.” So with respect to the Constitution of the United States, which was composed by the collected wisdom of the whole, union, after long deliberation it tvas found on experience to be defective, and to require sundry amendments, which have been already made ; and it is not yet, perhaps, quite perfect, which is the inevitable fate of all human institutions.
Of these circumstances Doctor Currie was fully apprized when he subscribed, and became a member of the society ; and therefore bad no just ground of complaint.
A few years’ experience taught the society that, under the original constitution, the risk was very unequal between the town and country subscribers, in favour of the former; and therefore it became necessary, in order to do justice to both classes, to separate their interests, as there was much more danger to the town than to the country houses, and therefore, on the principle of equality and reciprocity, a majority of the society, on a representation to the legislature, procured an act of Assembly, passed the 29th January, 1805, in which it is declared, that “ all premiums and quotas, in fu« “ ture, for the assurance of houses'in towns, shall be applied to “ the payment of losses sustained by the burning of houses in u towns, and none other. And vice versa respecting losses, “ by the burning of houses in the country.”
But it is objected that this regulation is not binding, because every individual member of the society was not con- *356 suited nor assenting to the regulation. It would be misspending time to refute this argument, as in all institutions of this kind, the acts of a majority are binding on the whole: , % by 'thé>civil law that majority must consist of two-thirds of 1 J r . . , , , the members. And the appellants’ principal had the less. reason to complain, as he was, by the 13th section of the same act, at full' liberty to withdraw from the society, on giving six weeks previous notice, and paying all arrearages due at the time of withdrawing.
As to the right of the assembly to alter the charter, I will just observe that it was, in effect, done by the society itself: who in order to give it more validity, did it under the sanction df a‘ legislative act, the same authority by which the institution was established j and I shall only subjoin a very correct note in Tucker's Blackstone, on the subject. That ‘‘ no corporation has been created in Virginia, since “ the revolution, but by an act of the Legislature; their pow- “ ers and privileges must therefore, depend wholly on the rt act Of Assembly by which they are first established, or “ such as have been afterwards made, for the special pur- “ pose of limiting or enlarging their privileges respectively.”
I, upon the whole, concur in the opinion, that the judgment be affirmed.

 Virginia, Bill of Right art. 15.